J-A19017-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: A.D., MOTHER | : | |
| | : | No. 38 WDA 2025 |

Appeal from the Order Entered December 5, 2024
In the Court of Common Pleas of Allegheny County
Juvenile Division at No: CP-02-AP-0000009-2024

BEFORE: BOWES, J., STABILE, J., and BENDER, P.J.E.

MEMORANDUM BY STABILE, J.:                **FILED: November 5, 2025**

A.D. (Mother) seeks review of an order of the Allegheny County Juvenile Division (trial court) which involuntarily terminated her parental rights to the juvenile, A.C. (Child), under subsections 2511(a)(2), 2511(a)(5), and 2511(b) of the Adoption Act, 23 Pa.C.S.A. §§ 2101-8415. She argues that the termination order was erroneously entered because the trial court's factual grounds for its ruling were not supported by the record. We affirm.[1]

The Allegheny County Office of Children Youth and Families (CYF) was first alerted to disturbances in Child's household in February 2020, before Child was born. At that time, Mother was arrested for stabbing Child's father after the two had gotten into an argument. Child's older sibling, J.C., was

_____

[1] The parental rights of J.C. (Father) were also involuntarily terminated as to Child. Father is not a party to this appeal, so that related termination order will not be addressed here.

present in the home during that episode, and the child was soon thereafter placed in foster care. Mother became pregnant with Child while J.C.'s dependency case was still pending.[2]

When Child was born, on January 7, 2022, CYF petitioned for an emergency custody order, which the trial court granted on January 10, 2022. The trial court did so because Mother had already been found non-compliant with her court-ordered mental health, substance abuse, and intimate partner violence (IPV) goals in J.C.'s case.

Child was adjudicated dependent on February 2, 2022, and as of that date, she has been removed from Mother's care. Child was placed with her current foster parents in December 2022.

Since the beginning of the present dependency matter, Mother has been required to submit to random drug screenings, and to continue making progress on her court-ordered goals, including mental health treatment, drug and alcohol treatment, IPV treatment, and visits with Child. Mother also was ordered to attend Child's medical and developmental service appointments. CYF developed a family plan which was meant to address the conditions that led to the removal and placement of Child.

The trial court held permanency review hearings on May 10, 2022; August 9, 2022; November 15, 2022; February 14, 2023; May 9, 2023; June

---

[2] Mother's parental rights as to J.C. were involuntarily terminated on March 1, 2022, and this Court upheld the termination. *See In Int. of J.C.*, No. 334 WDA 2022 (Pa. Super. filed March 1, 2022) (unpublished memorandum).

27, 2023, November 8, 2023; February 13, 2024; June 11, 2024; and September 17, 2024. At each of these hearings, Mother was found to be non-compliant with at least one of her court-ordered goals, and overall, Mother's progress was, at best, inconsistent. The trial court therefore repeatedly ordered that Child would remain in foster care.

CYF's petition to involuntarily terminate Mother's parental rights over Child was filed on January 29, 2024. In the petition, CYF asserted that Mother had not made adequate progress toward reunification with Child, and that the conditions which caused the Child to be placed in care had not been, and would not soon be, remedied. *See* CYF Petition for Involuntary Termination, 1/29/2024, at paras. 8-10.

The trial court held the termination hearing on November 1, 2024, and November 20, 2024. Several witnesses testified at the hearing regarding Mother's progress on her court-ordered goals, as well as the best interests of Child. The testimony of these witnesses established the following facts.

As to Mother's IPV goal, a CYF caseworker (Ruth Weaver) testified that there had been no recent IPV incidents between Mother and Father, and that Mother was no longer required to participate in IPV treatment. As Child's case progressed, as of June 2023, IPV was no longer a court-ordered goal for Mother. *See* N.T. Termination Hearing, 11/20/2024, at 325-26.

Despite her progress on her IPV goal, however, Mother did not consistently make progress with other goals or address the circumstances that

- 3 -

necessitated Child's placement in foster care. As of February 2020, CYF has referred Mother three times to the Pennsylvania Organization for Women in Early Recovery (POWER), to assist Mother with her drug and alcohol goals. At the termination hearing, the intake supervisor at POWER, Kevin Hoover, testified that Mother had an initial evaluation in February 2020. POWER diagnosed Mother with alcohol use disorder (mild), and cannabis use disorder (mild), and POWER recommended that Mother receive intensive outpatient treatment. POWER was unable to verify whether Mother had complied with these recommendations. *See id*., at 10-13.

Mother completed a second POWER evaluation on March 11, 2022, and she was diagnosed with alcohol use disorder (mild); cannabis use disorder (in sustained remission); and an unspecified anxiety disorder. As a result of this evaluation, it was recommended that Mother receive dual diagnosis treatment for her mental health and substance issues. Hoover testified that POWER was again unable to verify whether Mother had complied with these recommendations. *See id*., at 13-16.

Mother completed her third and final POWER evaluation on February 26, 2024, at which time Mother was diagnosed with alcohol use disorder (mild), in early remission; cannabis use disorder (mild), sustained remission; an unspecified anxiety use disorder; and a major depressive disorder/unspecified depressive disorder. POWER once more recommended that Mother should undergo dual diagnosis treatment, but again, POWER could not verify that Mother had complied with its recommendations. *See id*., at 15-16.

Between January 2022 and the date of the termination hearing, Mother attended 53 out of 131 court-ordered drug screens, missing 78 of them in that span. On nine of the occasions on which Mother was screened, she tested positive for marijuana metabolites, cocaine, and other controlled substances. *See id*., at 46-50. As of the date of the termination hearing in November 2024, Mother had not submitted to a screen since July 10, 2024. *See id*., at 51.

Mother began mental health treatment at the Chartiers Center some time in 2023. In July 2023, Mother's outpatient therapist at the Chartiers Center indicated that Mother likely needed to be in a higher level of care, such as intensive outpatient treatment. Also around this time, Mother disclosed to CYF that she had engaged in self-harming behaviors most of her life and that she had recently re-engaged in such behavior in the summer of 2023 due to stress stemming from the adoption of Child's sibling, J.C. *See id*., at 121. In April 2024, Mother was discharged from the Chartiers Center due to lack of engagement with her treatment programs. Mother did not re-engage in mental health treatment again until July 2024, at which time she entered a dual diagnosis intensive outpatient treatment program through Positive Pathways. *See id*., at 297-98.

Other goals for Mother were for her to consistently visit with Child and participate in and attend Child's medical and developmental service appointments. Since her birth, Child has had special needs and medical needs. Child has been diagnosed with Von Willebrand and neutropenia, and

Child's conditions frequently require her to receive emergency medical care and to be seen by several different medical specialists. *See id*., at 227-28. Further, Child receives developmental, occupational, and speech-related therapies. *See id*. at 227-33.

At the termination hearing, the CYF permanency caseworker, Ciera James, testified that at the time of Child's birth, Mother was not compliant with her court-ordered goals concerning Child. *See id*., at 194-96. This testimony was corroborated by the CYF direct services caseworker, Jason Van Ness, who stated that Mother had only attended four of 16 scheduled medical appointments for Child. *See id*., at 216. CYF caseworker, Ruth Weaver, testified that Mother also did not attend Child's therapeutic services or hospital visits, including one occasion when Child was being treated in a hospital emergency room for pneumonia. *See id*., at 298-301.

Finally, visitation with Child was both court-ordered and set as a goal for Mother in CYF's family plan for reunification. Since January 2022, Mother had been permitted to have four-hour long periods of unsupervised visits at Child's foster home. By May 2022, Mother was allowed to have overnight visits with Child if she could consistently attend court-ordered drug screens. However, Mother's failure to consistently attend drug screens prevented her from progressing to overnight visits. *See id*., at 300-01

Nevertheless, Mother continued to have unsupervised visits until July 11, 2023, at which point the trial court ordered that Mother's visits with Child would have to be fully supervised. The trial court did so in part out of concern

for severe bruising discovered on the Child's buttocks during an unsupervised visit with Mother. These injuries required medical attention, and they were sustained by Child during an unsupervised visit with Mother, who subsequently refused to visit Child in the hospital emergency room, telling caseworkers the injury "was not a big deal." *Id*., at 238-39, 301. Mother's visits with Child remained fully supervised until February 2024, when the trial court permitted Mother to have "bookended" visits so long as she consistently submitted to drug screens. *See id*., at 97-98.[3]

Ultimately, by the spring of 2024, Mother's visits again became fully supervised due to Mother missing two drug screens. Further, throughout this case, Mother did not attend visits consistently, and she never progressed to overnight visits. Despite intermittent periods of unsupervised visits, Mother's visits have remained supervised since the spring of 2024. *See* N.T. Termination Hearing, 11/20/2024, at 302-05. CYF was concerned that for the past two years, Mother's inconsistent visits with Child, lack of progress with her own treatment, and lack of participation in Child's medical needs and therapies were detrimental to Child's well being. *See id*., at 307.

As of the date of the instant termination hearing, Child had been in CYF care for almost three years, having been removed from Mother's care at the time of her birth on January 7, 2022. Ciera James, who had observed Child in her current foster home, testified that Child seems very comfortable with

_____

[3] Bookended visits allow for a period of unsupervised time in between supervised portions of a visit.

her foster parents, whom the Child looks to for comfort. James described Child's foster parents as being "very strong advocates for [Child]." N.T. Termination Hearing, 11/1/2024, a 201. James opined that Child's foster parents are meeting all of Child's needs, including her special needs, and the foster home is a pre-adoptive resource for Child. **See id**., at 201-02.

Further, CYF caseworker Ruth Weaver testified that, in her view, termination of Mother's parental rights would best serve Child's needs and welfare, as Child requires permanency. It was Weaver's opinion that, as of the date of the termination hearings, Mother would be unable to provide for Child's needs and overall well-being. **See** N.T. Termination Hearing, 11/20/2024, at 310-12.

The opinions of CYF caseworkers in this regard were consistent with those of Dr. Eric Bernstein, who conducted multiple psychological evaluations in this case and testified as to his observations and assessments, as well as his findings and conclusions based on these evaluations. In September 2023, Dr. Bernstein performed an individual evaluation of Mother and an interactional evaluation of Child with Mother. In February 2024, Dr. Bernstein performed an interactional evaluation of Child with her current foster parents. Most recently, in July 2024, Dr. Bernstein performed an updated individual evaluation of Mother and an updated interactional evaluation of Child with Mother. **See** N.T. Termination Hearing, 11/1/2024, at 79-82.

Based on the initial individual evaluation of Mother, Dr. Bernstein diagnosed her with major depressive disorder (moderate). At the second

individual evaluation, Mother was diagnosed with adjustment disorder (with anxiety). Although it appeared that Mother had made some progress with her mental health goal between her initial evaluation and her most recent evaluation, Dr. Bernstein believed Mother's mental health remained a major concern. *See id*., at 83.

In fact, Dr. Bernstein was especially concerned that Mother continued to lack accountability for the circumstances that led to Child's removal from her care. He explained that, "[o]ther than [Mother's] own acknowledgement of her mental health challenges historically, she has attributed responsibility to the father for his misjudgment and violence." *Id*., at 93. Dr. Bernstein opined that Mother was minimizing her own alcohol usage and responsibility for the episodes of domestic violence between her and Child's father.

Dr. Bernstein testified that, in his opinion, termination of Mother's parental rights would best meet Child's needs:

> [Mother's] condition to indulge in substance use in . . . interactions [with Child's Father] . . . seems to be a notable factor which result seems to be correlated to violence, too. There's issues regarding [Mother's] investments in the attendance of visits, which is a pretty clear measure of [Mother's] commitment and responsibility to work towards reunification. There is the matter that [C]hild is well connected to or attached to, if you will, the foster parents, that they provide [C]hild with a safe and stable home environment. To place [C]hild or to return [C]hild, excuse me, to one parent or the other's care would not only compromise [C]hild's established stability and security and even perhaps her thriving in adjustment but place her at risk given [Mother's] own . . . struggles.

*Id*., at 101-102.

From his interactional evaluations of Child with Mother in September of 2023 and July of 2024, Dr. Bernstein concluded that there was no significant parental bond. Although he found Mother to exhibit some positive parenting skills, he noted that on several occasions throughout the interactions, Child pointed towards the door of the waiting room door, where her foster mother was sitting. Although the interactions between Mother and Child appeared to go well, Dr. Bernstein believed that Child's primary bond and attachment was with her foster parents. *See id*., at 117.

Dr. Bernstein's opinion in this regard was in part based on his interactional evaluation of Child with and her current foster parents in February 2024. Dr. Bernstein found Child to have a "secure, healthy, and strong" bond with Foster Parents and that Child views Foster Parents as her psychological parents. *Id*., at 100. During the evaluation, Dr. Bernstein observed that Child referred to her foster parents as "mama" and "dada." *Id*., at 99. Dr. Bernstein also testified that Child's foster parents are providing for all of Child's needs, and that Child appeared to be thriving in her foster home.

At the conclusion of the termination hearing, the trial court found that CYF had proven by clear and convincing evidence that there existed grounds for the involuntary termination of Mother's parental rights under subsections 2511(a)(2) and 2511(a)(5) of the Adoption Act. *See* Trial Court 1925(a) Opinion, 4/17/2025, at 6-10. The trial court also found that terminating Mother's parental rights would best serve the needs of Child under subsection 2511(b). *See id*., at 11-13.

Mother timely appealed the termination order, and in her brief, she now raises two issues for our consideration:

> **I**. Whether the trial court erred as a matter of law and/or abused its discretion by finding grounds to terminate the parental rights of Mother under 23 Pa.C.S. §§ 2511(a)(2), (a)(5), of the Adoption Act, where conditions that led to the removal of Child did not exist at the time of the filing of the petition or six months prior to the filing of [the petition to terminate parental rights].
>
> **II**. Whether the trial court erred as a matter of law and/or abused its discretion in finding, pursuant to 23 Pa.C.S. § 2511(b) of the Adoption Act, finding that the bond between Mother and Child was not necessary and beneficial.

Mother's Brief, at 4-5 (numbering added).

At a hearing on a petition to involuntarily terminate parental rights, the party seeking termination has the burden of proving by "clear and convincing evidence" that there are grounds which support the granting of the petition. *In re Adoption of B.G.S.*, 245 A.3d 700, 705 (Pa. Super. 2021). This standard requires evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to clear conviction, without hesitation, of the truth of the precise facts at issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (citations omitted).

On review of an order granting or denying a petition to involuntarily terminate parental rights, this Court must "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012)). "If the factual findings are supported,

- 11 -

appellate courts review to determine if the trial court made an error of law or abused its discretion." *In re T.S.M.*, 71 A.3d at 267 (quoting *In re Adoption of S.P.*, 47 A.3d at 826).

A termination order cannot be vacated solely on the ground that the record could support a different result. *See T.S.M.*, 71 A.3d at 267. "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted). As the finder of fact at a termination hearing, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S.A. § 2511, governs the termination of parental rights, and requires a bifurcated analysis. *See In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). "Initially, the focus is on the conduct of the parent." *In re Adoption of A.C.*, 162 A.3d 1123, 1128 (Pa. Super. 2017) (citation omitted). "The party seeking termination must prove . . . that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." *Id*. (Citation omitted).

If the trial court determines that the parent's conduct warrants the termination of parental rights over a child as to any single subsection of section 2511(a), then the court must then engage in "the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare

of the child under the standard of best interests of the child." ***Id***. (citation omitted). In order to affirm a termination order, it is only necessary for this Court to uphold the trial court's decision as to a single subsection of Section 2511(a), as well as Section 2511(b). ***See In re K.Z.S.***, 946 A.2d 753, 758 (Pa. Super. 2008); ***see also In re K.R.***, 200 A.3d 969, 979 (Pa. Super. 2018) (*en banc*) (stating that once a reviewing court has found that a trial court's determination as to one subsection of section 2511(a) is supported by the record, it is unnecessary for the reviewing court to further consider the trial court's determinations as to additional subsections).

Mother's first claim is that the trial court's findings as to subsections 2511(a)(2) and 2511(a)(5) of the Adoption Act are unsupported by the record. These provisions allow the rights of a parent in regard to a child to be involuntarily terminated on the following grounds:

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * * *
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of

time and the termination of the parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(2), (a)(5).

Here, we find that the record supports the trial court's determination that termination was warranted. Under subsection 2511(a)(2), termination may be found proper where the party seeking termination has proven "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted).

Grounds for termination pursuant to section 2511(a)(2), however, "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id*. (citation omitted). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental duties." *Id*. (citation omitted). When a parent cannot do so, or cannot provide a safe environment for the child, termination of parental rights is justified. *In re Adoption of Michael J.C.,* 486 A.2d 371, 375 (Pa. 1984).

The record establishes in the present case that Mother has had several years to make progress on her goals for reunification. While she did make some limited progress in her goals as to IPV, substance abuse, and mental health, this did not occur prior to the filing of CYF's petition for termination. In fact, Mother's progress was not evident until six months after the petition

was filed. At the time of the termination hearing, Mother had only received a few months of consistent dual diagnosis treatment.

Mother herself acknowledged that this was the longest period of stability she has had since this case began. **See** N.T. Termination Hearing, 11/20/2024, at 438. Yet, Mother still refused to acknowledge that her drug, alcohol, and mental health issues might require significant treatment in the future. **See id**.

Since the inception of this case, CYF has attempted to assist Mother in meeting her court-ordered goals and reunifying with her Child. CYF referred Mother to POWER to address her substance abuse and mental health needs. Mother failed to utilize her drug screens to prove consistent sobriety. She was kept informed of all of Child's many appointments and therapies, but Mother did not consistently attend them. Nor has Mother consistently attended visits with Child.

As of the date of Child's birth, Mother has been either unwilling or incapable of completing her goals and doing what was necessary for reunification with Child. Moreover, Mother was unable to progress to overnight visits with Child. At the time of the termination hearing, her visits had been supervised for nearly a year. While visits generally went well, Mother's involvement with Child has been inconsistent throughout the case.

In sum, almost five years after CYF originally became involved with Mother due to substance abuse, IPV, and mental health instability, and almost three years after Child was born, Mother had still not completely remedied her

substance abuse and mental health concerns, has not invested in Child's many needs, and has not consistently visited Child.

The trial court heard credible testimony that, after many years of attempted services, Mother had only recently begun to make significant progress on several of her goals. The record supports the trial court's conclusion that Mother's repeated and continued incapacity, neglect, or refusal has caused Child to be without essential parental care, control or subsistence necessary for her physical and mental well-being. The record also confirms that the causes of Mother's incapacity, neglect or refusal cannot or will not soon be remedied. *See id*. Thus, the trial court did not err in finding termination to be proper under subsection 2511(a)(2).

In light of our disposition as to subsection 2511(a)(2), it is not necessary for this Court to consider the trial court's rulings as to subsection 2511(a)(5). *See B.L.W.*, 843 A.2d at 384; *In re K.R.*, 200 A.3d at 979.[4] We therefore turn to the trial court's findings as to subsection 2511(b), which gives "primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b).

When determining whether termination meets the needs and welfare of the Children, courts "should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above

---

[4] We add that Mother has not briefed the discrete issue of whether the trial court erred in finding termination to be warranted under 23 Pa.C.S.A. § 2511(a)(5). Accordingly, there are no specific contentions on the part of Mother to address as to that ruling.

- 16 -

concerns for the parent." ***Interest of K.T.***, 296 A.3d 1085, 1105 (Pa. 2023).

While the bond between parent and child is an important factor, courts must

ultimately determine whether the bond is necessary and beneficial to the child,

"*i.e.*, whether maintaining the bond serves the child's developmental,

physical, and emotional needs and welfare." ***Id***., at 1113. Additionally,

> [t]he determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.
>
> Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The courts must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

***Id***., at 1105-06.

"The extent of any bond analysis . . . necessarily depends on the

circumstances of the particular case." ***In re K.Z.S.***, 946 A.2d 753, 762-63

(Pa. Super. 2008) (citation omitted). "[O]nly a necessary and beneficial"

parental bond should be maintained. ***Interest of K.T.***, 296 A.3d at 1009.

Such a bond is considered to be "necessary and beneficial" if severing it would

result in "extreme emotional consequences" or significant, irreparable harm

to the child. ***Id***. at 1109-10.

Further, "bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the [s]ection 2511(b) analysis." *Id*., at 1109. It is "within the discretion of the [trial] court to prioritize the safety and security needs of [children] over their bonds with their parents[.]" *Interest of M.E.*, 283 A.3d 820, 839 (Pa. Super. 2022).

Here, the evidence established that Child was removed from Mother's care at the time of Child's birth. CYF filed the petition to terminate Mother's parental rights when Child was almost three years old.

CYF caseworkers, Ciera James and Ruth Weaver, both testified that they had observed Child in her pre-adoptive foster home on many occasions. The Child was seen seeking comfort and affection from her foster parents, and all of Child's needs were met. Similarly, Dr. Bernstein testified that determining the bond between a child and a caregiver includes not only observations of the interaction between them, but also measuring investment and responsivity of the caregiver. *See* N.T. Termination Hearing, 11/1/2024, at 124.

As to the bond between Child and Mother, Dr. Bernstein testified that the interaction between them was positive. However, considering the inconsistency of Mother's visits, compounded by the lack of providing parental responsibility on a regular basis, that bond was compromised. The bond he

observed between Child and her foster parents was "strong, healthy, and secure." *Id*., at 100.

Dr. Bernstein testified that, in his expert opinion, termination would serve Child's best interests. He opined that the bond that exists between her and Mother is not necessary, as Child is otherwise in full-time care with foster parents whom she views as her psychological parents, and who meet her everyday needs. *See id.*, at 150. Dr. Bernstein opined further that severing the bond that exists between Child and Mother would not have a significant impact on her. *See id.* at 152.

Conversely, to remove Child from the home in which she has such stability "could be tantamount to traumatic, and it could have a negative effect on her emotional security, felt comfort, and her overall functioning emotionally and developmentally as well." *Id*., at 179.

In sum, the record establishes that Child has benefitted from the stability of her pre-adoptive home for two years. The bond between Child and her foster parents is strong and stable, and Child's foster parents have met all of Child's developmental, physical, and emotional needs. The record also shows that the bond between Mother and Child is not necessary, and that terminating that bond would not result in extreme emotional consequences or significant, irreparable harm to Child. Thus, as the record supports the trial court's findings, we discern no abuse of discretion, and the termination order must be upheld.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 11/5/2025